**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00345-CR**

_____

**ANTHONY DWANE MOORE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-10-14475-CR**

## MEMORANDUM OPINION

In three issues, Anthony Dwane Moore challenges his conviction of murder and argues: (1) the trial court erred by not submitting the lesser-included offenses of manslaughter and negligent homicide in the jury charge; (2) the trial court abused its discretion by admitting into evidence the body camera video showing the victim; and (3) the evidence was insufficient to convict him of murder. *See* Tex. Penal Code Ann. § 19.02(b)(2). As more fully discussed below, we affirm the judgment of the trial court.

1

## Background

A Montgomery County grand jury indicted Moore for the first-degree felony offense of murder for the October 18, 2021, death of Laura Martelli. *See id.* The indictment stated that Moore intended to cause serious bodily injury to Martelli, and he committed an act clearly dangerous to human life that caused Martelli's death by striking Martelli with a deadly weapon, namely, a motor vehicle.

In October 2023, Moore's jury trial began. As its first witness, the State called Vanessa Joyce, Martelli's friend and former neighbor. She testified that she and Martelli became friends because both were from Brazil and both had American partners, and that she met Moore on Thanksgiving in 2018 at Moore's home. Her first impression of Moore was that he was a "good guy." At that time, Martelli and Moore were dating. According to Joyce, he treated Martelli well in the beginning, including asking her to stop working and stay at home. Joyce observed that Moore was also very nice to Martelli's daughter in the beginning, and she called him "dad."

Joyce testified that in 2019, Moore and Martelli moved from the neighborhood due to money issues, and Martelli's daughter's autism caused Moore and Martelli to fight. Joyce often watched Martelli's daughter and noticed that Martelli's daughter's behavior changed in that she seemed afraid that she would get in trouble if she did something without permission when Moore was around. Joyce testified that she watched Martelli's daughter more often leading up to October 2021.

2

According to Joyce, Martelli confided in her that Moore was telling her what to do and that Martelli tried to be more independent and began selling items online. Joyce testified that on October 17, 2021, Martelli texted Joyce that she broke up with Moore, and she came to Joyce's home crying, upset, and "very afraid" after Moore threw their dog against the wall during an argument. Martelli's daughter, who was nine years old at the time, witnessed the incident. Joyce allowed Martelli to stay with her because she was afraid for Martelli's life.

The next day, October 18, 2021, Joyce learned that Martelli had been killed. Joyce testified that Martelli's daughter was put in foster care the first day, but she later came to live with Joyce. Martelli's daughter now lives in Brazil.

Next, the State called Jessie Pena Maldonado, a patrol police officer employed by the Spring Valley Village Police Department. On October 18, 2021, Maldonado recalled that he worked the daytime shift and received a call to respond to the residence of Rosalind Newton for a welfare check. The welfare check was in reference to a possible murder investigation. He did not know who the suspect was or if there was a suspect.

Maldonado testified that once he arrived on the scene, he met with Newton and learned the suspect was Moore. He explained that Newton appeared "highly emotional, frantic[,]" excited and was crying. A copy of Maldonado's body camera footage was admitted as evidence and played for the jury. Maldonado stated that the

3

footage was a fair depiction of his interaction with Newton. In the video, Maldonado received information that Moore was no longer on the scene and had left in an Escalade. Maldonado did not know where Moore went, but he advised dispatch. Maldonado testified that Newton explained that Moore came to her house in a "calm" state and told her that he killed Martelli.

Through his investigation, Maldonado learned that Conroe Police were investigating the murder, and he passed the information to one of the detectives. Maldonado completed a report on the incident and did not investigate further.

The State then called Rosalind Newton. Newton testified that Moore is her personal trainer, and she identified him in the courtroom. She stated that she owned property in Conroe that she rented to Moore at a low cost so that he would have somewhere to live. Martelli lived with Moore at the property, and Newton understood that Martelli and Moore had been in a dating relationship for about two years. According to Newton, she spent time with Martelli and Moore, and she helped Moore out financially on occasion.

According to Newton, in the days leading up to her death, Martelli changed the locks on the apartment. She testified that on October 18, 2021, she was inside her home preparing to walk her dogs when she heard a man's voice in her house calling her name. After her name was called a third time, Newton recognized the voice and saw Moore standing in her kitchen/living area. Newton explained that she

4

could tell that something was wrong, and when she asked, Moore said "I killed Laura. She's dead." Newton testified that Moore just stood still, and she began walking in circles and questioned if Moore was joking. Newton indicated that she asked Moore if he strangled Martelli and he said, "Yes, I strangled her and I ran over her with a car."

Newton testified that her next thought was Martelli's daughter, and Moore indicated that she was at school. Newton knew that Martelli's daughter was a stressor in their relationship based on conversations with Moore and Martelli. According to Newton, Moore asked that she call his sister.

According to Newton, she told herself to be calm but also considered the short distance she would need to run to escape her home. She explained that she was scared because Moore had just told her that he murdered someone, and she believed he was capable of hurting her. Newton ultimately allowed Moore to call his sister from her phone, and while on the phone, Newton explained that she needed to take her dogs outside to use the bathroom, so she left. At that time, Moore was sitting on a stool in her kitchen.

Newton testified that she went next door and explained to her neighbor that a friend had come into her house and told her that he killed his girlfriend. The neighbor called 911. Her neighbor noticed Moore getting in a car and driving off. Newton stated that she looked out of the window and saw him driving off. She indicated that

5

he was in a white Escalade but later stated that it is possible that the Escalade was black.

Tamarah Tribie testified that she is a paramedic and recalled being notified of a vehicle-versus-person incident at a gas station off Walden Road. Tribie stated that once on scene, they found a woman, later identified as Martelli, lying on her back on the ground in the middle of the parking lot. According to Tribie, Martelli was able to speak and told them she was hit by a vehicle driven by her ex-boyfriend.

Tribie testified that once in the ambulance, Martelli was still talking. Martelli was calm but stated that she was hurting, in pain, and felt like she was going to pass out. Tribie indicated that they were cutting off her clothes, looking for external injuries, and placing monitors on Martelli. Tribie noticed that more of Martelli's injuries were on her right side in the flank area by her kidney and her legs. Her injuries were abrasions, bruises, and road rash, and her injuries were consistent with Martelli's statement that she was hit by a vehicle driven by her ex-boyfriend.

Tribie drove the ambulance and transported Martelli to Conroe Regional Hospital while Tribie's partner continued talking to and treating Martelli. Once at the hospital, this concluded Tribie's care of Martelli, though she later learned that Martelli died.

The State called Grimes County patrol officer, Ashley Brockett, as a witness. According to Brockett, in October 2021, she worked at the Conroe Police

Department as a patrol officer and commonly worked in George District, an area near Walden. On October 18, 2021, Brockett worked from 6:00 a.m. to 6:00 p.m. and was accompanied by a training officer. At approximately 8:20 a.m., she responded to an unknown disturbance call at the Walden Road Xpress Mart.

Brockett acknowledged that prior to testifying she listened to the 911 call that was placed on the morning of the incident and described the voices of the callers as very excited and stressed. The caller stated that Anthony Moore threw a woman down and ran over her with the car. A recording of the 911 call was admitted and played to the jury.

Once she arrived at the Xpress Mart, Brockett learned that the suspect fled the scene, so she obtained information on the suspect and his travel direction. Brockett testified that she observed a black BMW parked near the gas pumps, and saw a woman, later identified as Martelli, being attended to by fire and EMS. Martelli was moaning and appeared to be in pain, but once loaded in the ambulance, Brockett was able to speak with her. Their conversation was recorded on Brockett's body camera, and she reviewed it prior to testifying.

While at the Xpress Mart, Brockett viewed the store camera that recorded the incident, and the police department later received a copy of it. A copy of the video was admitted as evidence and played for the jury. Brockett testified that in the video a black Cadillac Escalade appears, the door closes, and the car backs up. At that

point, a woman is seen lying on the ground on the driver's side of the Escalade, and the woman was identified as Martelli. The Escalade then turns towards Martelli and runs over and drags her. Brockett indicated that seeing the Escalade's tires turn left towards Martelli signaled Moore's intent to run over Martelli. Moore then fled the scene.

A copy of Brockett's body camera video was admitted as evidence and played for the jury. Brockett testified that video from her body camera shows her in the ambulance speaking with Martelli. Martelli stated that her ex-boyfriend, Moore, ran over her in a black Cadillac Escalade. This was the last conversation that Brockett had with Martelli before she died. Based on her conversation with Martelli, she determined that Moore was the driver of the Escalade.

Brockett was later informed by one of the EMTs that Martelli stated that she was driving the Escalade, and that Moore had taken it. Brockett was initially under the impression that Martelli owned the BMW located at the Xpress Mart, but documents in the car confirmed that it belonged to Moore. Moore's Texas driver's license was also located inside the car.

On cross-examination, Brockett testified that she did not know what started the altercation between Moore and Martelli.

Next, the State called Charles Roper, a licensed peace officer and detective with the Conroe Police Department to testify. Roper stated that on October 18, 2021,

his lieutenant notified him about a murder investigation. His role in the investigation was to meet with Moore's sister in an effort to locate him.

Roper met with Moore's sister at her home and was permitted to check the home to see if Moore was there. Moore's sister indicated that Moore might be suicidal and might do something to get law enforcement to shoot him. Roper learned that Moore might have been in contact with Rosalind Newton, a friend of both Moore and his sister, and Moore's business partner. Roper also learned that Moore may have been in contact with his counselor, and Roper attempted to contact the counselor because he was interested in getting any statements from Moore and help in locating him.

Before leaving Moore's sister, Roper informed her that Martelli was deceased, and Moore's sister was surprised and then very emotional. Moore's sister knew Martelli and Martelli's daughter, and she was emotional about Martelli's daughter being alone.

Roper asked Moore's sister to call him if she heard from Moore, and she later called and provided information on his whereabouts. According to Roper, Moore's sister provided the phone number that Moore called her from, and Roper determined that it was a Timewise gas station on the Katy freeway. Roper contacted the gas station, and Moore was ultimately taken into custody there.

Before taking Moore into custody, Roper went to the Timewise gas station and observed the Escalade in question parked in front of the gas station. Roper then located Houston Police Department officers near the gas station waiting to assist with apprehending Moore. Roper later learned that Moore contacted the police department from the gas station and identified himself as a murder suspect. Roper testified that he quickly informed the officers of Moore's sister's concerns that Moore could possibly attempt to get law enforcement to shoot him; then he and the officers remained on standby for approximately an hour and a half as other officers responded, and a plan was put in place. Although Roper wore a body camera, he was likely too far away for it to capture Moore's arrest, and gas pumps were blocking the view. Roper observed Houston Police officers approach Moore from the side and give him commands through the public address (PA) system. Moore ultimately got out and ran around the front of the Escalade, made a knife motion, and took off running. Houston Police placed Moore into custody after releasing a canine that bit Moore on the leg. Moore was later cleared for transport to Montgomery County that night. On cross-examination, Roper stated that he did not determine what started the incident between Moore and Martelli.

The State then called Cassondra Cunningham, a crime scene investigator with the Conroe Police Department. On October 18, 2021, the crime scene sergeant instructed Cunningham to go to the hospital to photograph a female who had been

10

run over. Cunningham testified that at the hospital, she photographed Martelli and collected any clothing or evidence that came with Martelli to the hospital that was not on her. She also processed the Escalade and BMW. Cunningham indicated that while photographing Martelli, she observed injuries consistent with her being run over, as she had road rash on the left and right sides of her body, including her left hip, right hip, right leg, right shoulder, across the top of her back, and on her lower back going to her legs. Cunningham also noticed a red mark on Martelli's collarbone area.

Cunningham collected the clothing that Martelli wore when she was transported to the hospital, jewelry from the nurses, and contents taken on the scene from the BMW that belonged to Moore that included a wallet, key fob, and two phones. Cunningham later photographed the BMW, and the Escalade involved in this case. Regarding the Escalade, Cunningham testified that she noticed some defects, including one that appeared to indicate the front of the Escalade struck something on the driver's side. Cunningham also noted that the running board or bottom of the driver's side of the vehicle appeared to have gone through mud or dirt. It also appeared that some of the mud was removed. Imprints of fingertips and a full finger were photographed, along with the undercarriage of the Escalade, although nothing significant was noted.

11

Cunningham testified that she also photographed the interior of the Escalade and found empty and half-empty medicine bottles, and empty beer bottles. According to Cunningham, these items typically indicate someone is trying to commit suicide. She learned as part of her investigation that Moore was suicidal. Martelli's wallet with her driver's license was also inside the Escalade.

Cunningham stated that she learned that the Escalade was in the name of Martelli's ex-husband. Cunningham opined that based on the weight of the Escalade, roughly 6,400 pounds, it is capable of causing serious bodily injury or death and if running someone over, would be considered dangerous to human life. The photos Cunningham took were admitted as evidence.

Next, the State called Dr. Kathryn Pinneri, a board-certified forensic pathologist and Director of Montgomery County Forensic Services. As Director, Dr. Pinneri testified that she performed autopsies, supervised all employees, and would review and cosign some of the cases. She then described the autopsy procedure, and the report prepared upon completion of the examination.

Dr. Pinneri testified that Dr. Alex John, a forensic pathologist, conducted Martelli's autopsy. Dr. John prepared a report, Dr. Pinneri reviewed it, and both doctors signed the report. According to Dr. Pinneri, photos are taken of the body from the time it arrives at the lab until the autopsy is complete, and this was the case

for Martelli. The photos were admitted as evidence, and Dr. Pinneri testified that they fairly and accurately depicted Martelli's body on October 19, 2021.

According to Dr. Pinneri, the autopsy report detailed that Martelli arrived at the hospital at 8:57 a.m. on October 18, 2021, where she was diagnosed with rib fractures, that she went into cardiac arrest while being transported to the operating room, and she was pronounced deceased at 10:31 a.m. The autopsy took place the next day. Dr. Pinneri stated that the report detailed that Martelli had pinpoint hemorrhages in the lining of the eye and bruising along the jawline and neck area. She testified that she was familiar with how Martelli was killed as she reviewed the report and video surveillance prior to reviewing the report. Dr. Pinneri indicated that it does not appear that Martelli's neck injuries were caused by the car but were consistent with strangulation.

Dr. Pinneri indicated that Martelli had an abrasion on her torso that looked a little like road rash. Martelli had rib fractures on the back of her body, a large amount of blood in her chest cavity, injury to the spleen, a large amount of blood in her abdominal cavity, fractured pelvis, and complete cut of the large blood vessels inside the right leg that resulted in significant internal bleeding. Dr. Pinneri explained that Martelli's ribs were intact on the front of her body but broken along the back of her body, and the broken ribs resulted in broken blood vessels and internal bleeding. She indicated that when blood collects in a space outside of the blood vessels, vital

organs are not getting adequate oxygen, including the heart and brain. Martelli had two compartments inside her body where blood was accumulating so she progressively lost consciousness and had decreased oxygenation. The ruptured leg artery further decreased the available blood for her body. Martelli's injuries were consistent with somebody run over by an SUV, and she also had evidence of neck compression. Based on the autopsy and her review of the evidence, it was her opinion that Martelli's cause of death was multiple, blunt force trauma, and the manner of death was homicide.

On cross-examination, Dr. Pinneri testified that she reviewed Martelli's toxicology screening, but it did not affect her opinion as to the cause and manner of death. Blood from Martelli's femoral veins in her leg collected during the autopsy was sent for toxicology at the NMS Labs in Pennsylvania. Dr. Pinneri testified that she does not have any reason to disbelieve the reliability of Martelli's toxicology report.

The State rested its case after Dr. Pinneri's testimony, and Moore motioned for an instructed verdict that alleged that the State had not proven the elements of the offense as alleged in the indictment. The trial judge denied the motion.

Both the State and Moore presented closing arguments, and after deliberating, the jury found Moore guilty of murder as charged in the indictment.

Moore elected to have the jury assess his punishment. He pleaded true to the State's Notice of Enhancement, that he was previously convicted of conspiracy to distribute and possess with intent to distribute anabolic steroid, and conspiracy to distribute and possess with intent to distribute methylone.

After deliberating, the jury sentenced Moore to life imprisonment.

Moore argues three issues on appeal. First, Moore argues that the trial court committed an egregious error when it failed to include lesser-included offenses of manslaughter and/or negligent homicide. Next, Moore argues that the admission of the officer's body camera video of Martelli was inadmissible hearsay and violated Moore's constitutional rights under the confrontation clause. Last, Moore argues that the evidence was insufficient to support his murder conviction.

## ISSUE THREE: SUFFICIENCY OF THE EVIDENCE

In his third issue, Moore argues that the evidence at trial was insufficient to convict him of murder because while the evidence may have shown his intent to commit an assault against Martelli, the evidence was insufficient to prove that he intended to cause Martelli's death. Moore asserts that driving away from the scene, in which the vehicle ran over Martelli, was not definitive proof of an act clearly dangerous to human life that causes the death of an individual intended by Moore. If sustained, issue three would result in rendition of a judgment of acquittal, so we

address it first. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* Tex. R. App. P. 47.1.

When reviewing a conviction for legal sufficiency, we consider whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *See Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citations omitted). We presume the factfinder resolved any evidentiary inconsistencies in favor of the verdict and defer to its role as the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Clayton*, 235 S.W.3d at 778 (citations omitted).

A person commits murder under section 19.02(b)(2) if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes

16

the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(2). The indictment stated that Moore intended to cause serious bodily injury to Martelli, and he committed an act clearly dangerous to human life that caused Martelli's death by striking Martelli with a deadly weapon, namely, a motor vehicle. In accordance with the statute, the State was required to prove that Moore intended to cause serious bodily injury, not that he intended to kill Martelli as he argues on appeal. *See id*. Under section 19.02(b)(2), the mens rea element requires only that the accused must have intended to cause serious bodily injury to an individual. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (citing *Lugo-Lugo v. State*, 650 S.W.2d 72, 81-82 (Tex. Crim. App. 1983) (op. on reh'g)). However, "[d]irect evidence of the requisite intent is not required[.]" *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

> A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims…This has been the rule in Texas for over 100 years.

*Id.* (citation omitted); *see Shugart v. State*, 796 S.W.2d 288, 292 (Tex. App.—Beaumont 1990, pet. ref'd) (explaining where intent is the only element unsupported by direct proof, it may be inferred from circumstances in evidence).

Depending on the circumstances, a jury may infer intent when a defendant accelerates a motor vehicle. *See, e.g., Hunter v. State*, 468 S.W.2d 96, 99-100 (Tex. Crim. App. 1971) (defendant accelerated motor vehicle while passenger was half-

17

way in the window resulting in serious bodily injury); *Shugart*, 796 S.W.2d at 290-93 (jury was free to disbelieve defendant's testimony that he did not intend to hit victim with his car and infer intent where contrary evidence showed his vehicle's tires squealed, moved forward, struck and knocked victim down, and drove off without rendering aid); *Samuels v. State*, 785 S.W.2d 882, 886 (Tex. App.—San Antonio 1990, pet. ref'd) (jury found defendant "acted with intent to cause serious bodily injury at the moment he accelerated as his mother clung to the hood of the car[]"); *see also Franco v. State*, No. 09-22-00027-CR, 2023 WL 8609289, at *8 (Tex. App.—Beaumont Dec. 13, 2023, pet. ref'd) (mem. op., not designated for publication) (concluding that a rational jury could infer that appellant intended to cause serious bodily injury when he accelerated the vehicle and drove into the complainant without braking or swerving).

The record shows that the evidence before the jury included video from the convenience store parking lot that showed the Escalade back up enough to show Martelli on the ground and near the driver's side front tire. The Escalade then drove forward and turned to the left, running over and dragging Martelli before it drove out of view and fled the scene. The jury also heard the testimony of two witnesses. First, Officer Brockett testified that seeing the Escalade's tires turn left towards Martelli signaled Moore's intent to run over Martelli. And the jury heard the testimony of Investigator Cunningham that the Escalade weighed roughly 6,400

18

pounds, was capable of causing serious bodily injury or death, and if running someone over would be considered dangerous to human life. The jury, as factfinder, is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony of Officer Brockett and Investigator Cunningham and resolve conflicts in the evidence. *See Jackson*, 443 U.S. at 318-19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13. We will not reweigh the evidence or its credibility, nor will we substitute our judgment for the jury's. *See McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could infer Moore's intent to cause serious bodily injury to Martelli when he accelerated the vehicle and drove over Martelli and caused her death. *See Hart*, 89 S.W.3d at 64. We hold the evidence was sufficient to support Moore's murder conviction. We overrule issue three.

## ISSUE ONE: JURY CHARGE INSTRUCTION

Moore argues the trial court failed to give the jury an instruction on the lesser offenses of manslaughter and/or negligent homicide. Moore contends that although there was evidence of a history of abuse of Martelli, the evidence at trial did not show a clear intent to end Martelli's life, and therefore the lesser-included offense was a valid rational alternative. He further argues that the State did not present

19

evidence that Moore intentionally or knowingly caused Martelli's death, a murder charge requirement, therefore the lesser-included offenses should have been included.

Trial courts are required to instruct the jury on the law applicable to the case. *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021) (citation omitted). A claim of jury charge error involves a two-step analysis. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *see also Alkayyali v. State*, 713 S.W.3d 780, 789 (Tex. Crim. App. 2025). We must first determine whether error exists in the charge, and if we find error, we review the record to determine whether the error caused sufficient harm to warrant reversal. *Alcoser*, 663 S.W.3d at 165; *Alkayyali*, 713 S.W.3d at 789; *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). There are two standards of review of claims of jury charge error, and the standard we apply depends on whether the appellant timely objected to the charge in the trial court. *Alcoser*, 663 S.W.3d at 165; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). "Only if we find error do we then consider whether an objection to the charge was made and analyze for harm." *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citations omitted). However, if a charge error exists but the defendant failed to object to the alleged error at trial, we may reverse the judgment only if the error is so egregious that the defendant did not receive a fair and impartial trial. *See Almanza*, 686 S.W.2d

20

at 171; *see also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (discussing in context of accomplice witness testimony). "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citation omitted).

When lack of a defensive instruction is the complained of error, the *Almanza* framework does not apply, and "unrequested defensive instructions are still subject to ordinary rules of procedural default." *Williams*, 662 S.W.3d at 461 (citing *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998)); *see also Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010) (citations omitted). The Rules require that a trial court submit instructions only on the "law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14. It is a strategic decision of the defense whether to request an instruction on a lesser-included defense. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Therefore, absent a request from the defense, inclusion of an instruction on a lesser-included offense is not "the law applicable to the case," and article 36.14 does not impose a duty on the trial court to provide such an instruction sua sponte. *Tolbert*, 306 S.W.3d at 781; *Williams*, 662 S.W.3d at 461. Charge error regarding a lesser-included offense will not be considered on appeal absent a request or objection by the defense. *See Chavez v. State*, 666 S.W.3d 772, 778 (Tex. Crim. App. 2023) (citing *Tolbert*, 306 S.W.3d at 781).

Here, the record does not indicate that Moore requested the inclusion of the lesser-included offenses or that he objected to the absence of the lesser-included offenses in the jury charge. Moore does not argue that he requested the inclusion or that the trial court overruled his objection to the inclusion. Therefore, we conclude that the trial court did not err by failing to sua sponte submit a manslaughter and/or negligent homicide instruction during the guilt-innocence phase because Moore did not request an instruction or object to its absence. *See Posey*, 966 S.W.2d at 62. Since no error exists, we need not analyze for harm. *See Tolbert*, 306 S.W.3d at 782. We overrule Moore's first issue.

## ISSUE TWO: ADMISSIBILITY OF EVIDENCE

In his second issue, Moore argues that the trial court erred by admitting into evidence a hearsay video, namely the officer's body camera video, of Martelli. According to Moore, the video contained hearsay statements and violated his constitutional rights under the confrontation clause.

To preserve error for appellate review, the complaining party is required to make a timely and specific objection. *See* Tex. R. App. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). On appeal, Texas courts require that points of error correspond or comport with objections and arguments made at trial. *Dixon v. State*, 2 S.W.3d 263, 273 (Tex. Crim. App. 1998) (op. on reh'g); *see Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd). "Where a

trial objection does not comport with the issue raised on appeal, the appellant has preserved nothing for review." *Wright*, 154 S.W.3d at 241 (citations omitted); *see Resendiz v. State*, 112 S.W.3d 541, 547 (Tex. Crim. App. 2003); *Ibarra v. State* 11 S.W.3d 189, 197 (Tex. Crim. App. 1999).

On appeal, Moore argues that Officer Brockett's body camera video of Martelli contained hearsay statements and violated his constitutional rights under the confrontation clause. Moore argues that the video was bolstering and cumulative and that it was an abuse of discretion resulting in reversible error and unfair prejudice. However, the record indicates that when introduced at trial, counsel for Moore objected to the video's admission based on relevance. Therefore, because Moore's complaint on appeal does not comport with his objection made in the trial court, Moore failed to preserve this complaint for appellate review. *See* Tex. R. App. P. 33.1(a)(1); *see also Resendiz*, 112 S.W.3d at 547; *Ibarra*, 11 S.W.3d at 197; *Dixon*, 2 S.W.3d at 273; *Wright*, 154 S.W.3d at 241. We overrule issue two.

## CONCLUSION

Having overruled each of Moore's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on July 11, 2025
Opinion Delivered November 19, 2025
Do Not Publish
Before Golemon, C.J., Wright and Chambers, JJ.